UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GIA SESSA, on behalf of herself and all
others similarly situated,

                              Plaintiff,              No. 19-CV-9914 (KMK)

       v.                                             OPINION & ORDER

LINEAR MOTORS, LLC, et al.,

                              Defendants.

Appearances:

Daniel A. Schlanger, Esq.
Evan S. Rothfarb, Esq.
Schlanger Law Group LLP
New York, NY
*Counsel for Plaintiff*

Michael C. O'Neil, Esq.
Albert E. Hartmann, Esq.
Maxwell J. Eichenberger, Esq.
Reed Smith LLP
Chicago, IL
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

       Gia Sessa of Putnam Valley ("Plaintiff") brings this putative class action suit against

Linear Motors, LLC d/b/a/ Curry Hyundai Subaru, Hudson Valley Federal Credit Union

("HVFCU"), CULA, LLC (collectively, "Lessor Defendants"), and TransUnion, LLC,

(collectively, "Defendants"), alleging that Lessor Defendants hid certain fees and taxes paid by

Plaintiff upon leasing a car in violation of the Consumer Leasing Act, 15 U.S.C. §§ 1667, *et seq*.;

New York Vehicle and Traffic Law, N.Y. Veh. & Traf. § 415, *et seq*.; and the New York

General Business Law, N.Y. Gen. Bus. § 349, and alleging that Defendant TransUnion failed to

accurately report Plaintiff's debt obligations vis-à-vis her vehicle lease in violation of the Fair

Credit Reporting Act, 15 U.S.C. § 1681, *et seq*. ("FCRA"), and New York General Business Law

§ 380, *et seq*. ("NY FCRA").  (*See* First Am. Compl. ("FAC") (Dkt. No. 4).)  Before the Court is

TransUnion's Motion for Summary Judgment.  (Not. of Mot. (Dkt. No. 111).)  For the following

reasons, TransUnion's Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule

56.1, specifically TransUnion's 56.1 Statement (Def.'s Rule 56.1 Statement ("Def.'s 56.1") (Dkt.

No. 113)) and Plaintiff's 56.1 Counterstatement (Pl.'s Rule 56.1 Counterstatement ("Pl.'s 56.1

Counterstatement") (Dkt. No. 123-20 (filed under seal), Dkt. No. 126 (redacted))), and the

admissible evidence submitted by the Parties.  The facts are recounted "in the light most

favorable to" Plaintiff, the non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d

Cir. 2018) (citation and quotation marks omitted).  The facts as described below are in dispute

only to the extent indicated.[1]

#### 1.  The FCRA

The FCRA requires that credit reporting agencies ("CRAs") prepare "consumer reports,"

known otherwise as credit reports, using "reasonable procedures to assure maximum possible

accuracy of the information concerning the individual about whom the report relates."  15 U.S.C.

§ 1681e(b).  The FCRA does not, however, require CRAs to review the underlying legal

---

[1] Where possible, the Court has relied on the undisputed facts in the Parties' 56.1
submissions.  However, direct citations to the record have also been used where relevant facts
were not included in any of the Parties' Rule 56.1 submissions, or where the Parties did not
accurately characterize the record.

documents giving rise to a consumer's debt obligations to verify the legal validity thereof prior to reporting said debt on the consumer's credit report.  (Pl.'s 56.1 Counterstatement ¶ 32.)

The FCRA also imposes various obligations on organizations that supply data to CRAs, known as "furnishers."  *See* 16 C.F.R. § 660.2.  Relevant to this case, the law bars furnishers from supplying information to CRAs it "knows or has reasonable cause to believe . . .  is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A); *see also* 12 C.F.R. § 1022.42(a) (regulations requiring furnishers to "establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information" furnished to CRAs).  The Consumer Financial Protection Bureau ("CFPB"), which oversees credit ratings practices, also requires furnishers to provide CRAs with information that "correctly[] [r]eflects the terms of and liability for the account."  12 C.F.R. § 1022.41(a)(1).

The FCRA does not pertain only to institutions; to the contrary, it encourages consumers to participate in the credit reporting process, animated by the belief that "enhancing consumers' access to their credit reports is an effective step towards ensuring an accurate credit reporting system."  S. Rep. No. 103-209, at 5 (1993).  To enable such participation, the FCRA affords consumers two mechanisms to dispute the accuracy of information listed on a credit report.  First, a consumer can submit a dispute directly to a CRA, who must then forward the dispute to the appropriate furnisher.  *See* 15 U.S.C. § 1681i(a)(1)(A).  Second, a consumer can submit a dispute directly to the furnisher.  *See id.* § 1681s-2(a)(8).

### 2.  TransUnion's General Processes Pursuant To Its CRA Obligations

Pursuant to the charge that a CRA use "reasonable procedures" to ensure accuracy, TransUnion will review a furnisher prior to accepting any information from that furnisher, a vetting process commonly referred to as "credentialing."  (*See* Pl.'s 56.1 Counterstatement ¶ 68.)

3

TransUnion's multi-faceted credentialing process includes but is not limited to reviewing the furnisher's reputation as well as the nature of the data to be furnished.  (*See id.* ¶¶ 63–67.)

If a furnisher passes the credentialing process, TransUnion also requires a furnisher to "contractually agree to, among other things, comply with all of the obligations imposed on that furnisher," including all applicable statutory and regulatory obligations under the FCRA, regulations promulgated thereunder, and equivalent state laws and regulations.  (*Id.* ¶ 69.) Importantly, per the agreement, data are also supposed to be furnished in a particular way, namely an industry-wide format called "Metro2," (*id.* ¶ 74), which "allows a furnisher to report a balloon payment obligation for any type of account with a deferred payment obligation, including an auto lease," (*id.* ¶ 41).

After TransUnion credentials and signs an agreement with a furnisher, it "conducts an onboarding process . . . with a furnisher to test and verify the integrity of the data the company intends to furnish."  (Def.'s 56.1 ¶ 75.)[2]  Once the data furnisher begins providing TransUnion with information, the company continues to monitor, screen, and validate the quality and integrity of data furnished, including using proprietary techniques and strategies.  (*See id.* ¶¶ 76–82.)

### 3.  Plaintiff's Car and Debt Instrument

In November 2018, Plaintiff leased a Subaru Forester from Linear Motors, which was financed by HVFCU.[3]  (*See id.* ¶¶ 1–3.)  The lease obligated Plaintiff to pay $237.75 per month.

---

[2] Plaintiff disputes this point, but only insofar as she lacks knowledge of the onboarding to be able to admit or verify this.  (*See* Pl.'s 56.1 Counterstatement ¶ 75.)

[3] The Parties dispute the nature of this debt instrument.  Plaintiff refers to this instrument as a "lease."  (*See, e.g.*, Pl.'s Mem. in Opp'n to Mot. for Summ. J. 15 ("Pl.'s Mem.") (Dkt. No. 123-19 (unredacted)).)  Defendant, meanwhile, at times refers to it as a "loan."  (*See, e.g.*, Defendant's Mem. of Law. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 112) 5.)

(*See* Decl. of Gia Sessa ("Sessa Decl."), Ex. 1 (Dkt. No. 124-1) at 4.)  The lease states that

$12,721.25 is the "Total of Payments," meaning "the Amount [Plaintiff] will have paid to [the

lessor] by the end of the Lease." (*Id.*)  The lease also states that the "Residual Value," meaning

"[t]he value of the Vehicle at the end of the Lease used in calculating [Plaintiff's] Base Monthly

Payment," is $19,444.07. (*Id.* at 2.)

Section 14 of the lease purports to release Plaintiff from any obligation following the

termination of liability assuming Plaintiff had performed by the terms of the contract.  (*See id.* at

3.)  Per Section J of the lease, Plaintiff had "the option to purchase the Vehicle . . . at the end of

the Lease Term for the Residual Value, assuming all payments are made on the exact scheduled

date, plus a Purchase Option Fee of $325 and applicable fees and costs." (*Id.* at 4.)

---

Plaintiff disputes this characterization. (*See* Pl.s's Mem. 15.)  For the reasons discussed below,
this semantic difference does not come to bear.  And where the Parties disputed facts with purely
semantic objections or by asserting irrelevant facts that do not materially challenge the substance
described, the Court will not consider them as creating disputes of fact.  *See Ocampo v. 455
Hosp. LLC*, No. 14-CV-9614, 2021 WL 4267388, at *1 n.1 (S.D.N.Y. Sept. 20, 2021) ("Where
the Parties identify disputed facts but with semantic objections only or by asserting irrelevant
facts, which do not actually challenge the factual substance described in the relevant paragraphs,
the Court will not consider them as creating disputes of fact."); *Baity v. Kralik*, 51 F. Supp. 3d
414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of [its]
admissions—improperly interject arguments and/or immaterial facts in response to facts asserted
by [the] [d]efendant[], often speaking past [the] [d]efendant[]' asserted facts without specifically
controverting those same facts. . . . [A] number of [the] [p]laintiff['s] purported denials quibble
with [the] [d]efendant['s] phraseology, but do not address the factual substance asserted by [the]
[d]efendant[]."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013
WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement
violated the rule because it "improperly interjects arguments and/or immaterial facts in response
to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n
other instances, . . . neither admits nor denies a particular fact, but instead responds with
equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at
*1 (S.D.N.Y. Aug. 19, 2002) (noting that plaintiff's 56.1 statement "does not comply with the
rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the
object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to
make").  Therefore, for purposes of this Opinion, the Court adopts the more common parlance of
"lease" with respect to a debt instrument to temporarily rent a car.

Notwithstanding the lease's terms, the Parties agree that "[t]he data [HVFCU] furnished to [TransUnion] indicated that Plaintiff owed a . . . payment of $19,444.00 . . . that was due on January 1, 2022," which is referred to as a "balloon payment."  (Pl.'s 56.1 Counterstatement ¶ 8.)[4]  HVFCU "also furnished information to [TransUnion] indicating that the 'High Balance' amount for her account was $25,928.60."  (*Id.* ¶ 13 (citation omitted).)  It is also undisputed that HVFCU furnished data regarding the lease in Metro2 format.  (*Id.* ¶ 35 (citations omitted).)

### 4.  TransUnion's and HVFCU's Actions and Interactions

TransUnion credentialed HVFCU.  (*See id.* ¶ 67 (citations omitted).)  TransUnion then entered into an agreement with HVFCU in 2016.  (*See id.* ¶ 70.)  TransUnion entered into a second agreement with HVFCU in 2019.  (*See id.*)  Both the 2016 and 2019 Agreements to which HVFCU agreed contain an identical, specific clause: "all information furnished to [TransUnion by HVFCU] shall be complete and accurate."  (*Id.* ¶ 72 (citations omitted).)  The Agreements also require HVFCU to furnish data in the industry-standard Metro2 format.  (*See id.* ¶ 74.)

During the time period in which the balloon payment appeared on Plaintiff's credit report, TransUnion did not receive any "hard" credit inquiries regarding Plaintiff, meaning Plaintiff did not make a formal application for new credit.  (*See id.* ¶¶ 44, 49.)  Throughout this time, though, TransUnion sent 13 credit reports to JP Morgan Chase Bank, Plaintiff's Bank.  (*See id.* ¶ 50.)

---

[4] The Parties dispute the precise definition of a "balloon payment."  (*See* Pl.'s 56.1 Counterstatement ¶ 9 (disputing Defendant TransUnion's definition of a "balloon payment.").)  This semantic dispute does not materially change the question before the court and will therefore be disregarded.  *See supra* n.3.  Nonetheless, for ease of reference in this Opinion, the Court uses the term "balloon payment" to refer to the final amount purportedly owed by Plaintiff.

Prior to the initiation of this suit, Plaintiff had "never spoken with anybody [representing TransUnion] about [her] Hudson Valley account." (*Id.* ¶ 61 (citation omitted).)  According to Plaintiff, she instead "disputed the balloon payment information with her lessors multiple times." (*Id.* ¶ 60.)

B.  Procedural History

The original Complaint was filed on October 25, 2019.  (*See* Compl. (Dkt. No. 1).)  Six days later, Plaintiff filed her First Amended Complaint.  (*See* FAC (Dkt. No. 4).[5])  Following an extension of time to answer the Complaint, (*see* Dkt. No. 20), HVFCU requested a pre-motion conference preceding a motion to dismiss the action, (*see* Dkt. No. 21).  Plaintiff opposed this request.  (*See* Dkt. No. 27.)  The Court ordered HVFCU to respond to Plaintiff's request.  (*See* Dkt. No. 28.)  HVFCU did so, (*see* Dkt. No. 29), and the Court ordered a pre-motion conference on February 13, 2020, (*see* Dkt. No. 31).  Pending the pre-motion conference, motion practice and correspondent deadlines were stayed.  (*See* Dkt. No. 35.)

Notwithstanding the stay, on January 7, 2020, Linear Motors filed an Answer with crossclaims against all other Defendants.  (*See* Dkt. No. 43.)  The following week, CULA similarly answered Plaintiff's Complaint and asserted crossclaims against all other Defendants. (*See* Dkt. No. 48.)

On January 28, 2020, TransUnion filed an Answer to Plaintiff's Amended Complaint, (*see* Dkt. No. 52), as well as an Answer to Linear Motors' crossclaims, (*see* Dkt. No. 53).  Five days later, on February 3, 2020, TransUnion filed an Answer to CULA's crossclaims.  (*See* Dkt. No. 56.)

---

[5] The Complaint states that it attached two separate exhibits.  (*See* FAC ¶ 30 (referring to "Exhibit 1"); *id.* ¶ 40 (referring to "Exhibit 2").)  No such exhibits are attached.  (*See generally* FAC.)

7

Following these submissions, the Court held its pre-motion conference as scheduled on February 13.  (*See* Dkt. (minute entry for Feb. 13, 2020).)  Two weeks later on February 27, 2020, the Court adopted a case management plan that bifurcated the validity of Plaintiff's claims and follow-on issues relating to class certification, staying the latter until motions regarding the former were fully briefed and adjudicated.  (*See* Dkt. No. 67.)

The following month, on March 4, 2020, HVFCU filed an Answer to CULA's crossclaims and asserted its own crossclaims.  (*See* Dkt. No. 69.)  On March 9, 2020, Linear Motors filed an Answer to HVFCU's crossclaims.  (*See* Dkt. No. 70.)  Finally, CULA filed an Answer to HVFCU's crossclaims the following day.  (*See* Dkt. No. 71.)

On October 15, 2020, Plaintiff filed a notice of preliminary settlement between the Plaintiff and Lessor Defendants and requested that the Court stay all pending deadlines against Lessor Defendants.  (*See* Dkt. No. 91.)  The Court granted this request the next day.  (*See* Dkt. No. 92.)  Dismissal with prejudice was stipulated on January 27, 2021.  (*See* Dkt. No. 99.)

Plaintiff and TransUnion, the only non-Lessor Defendant and the only Defendant with whom Plaintiff had not settled, then sought and received two subsequent discovery extensions. (*See* Dkt. No. 93; Dkt. No. 94; Dkt. No. 97; Dkt. No. 98.)  Thereafter, the Court held a pre-motion conference on May 20, 2021, and adopted a briefing schedule.  (*See* Dkt. (minute entry for May 26, 2021).)

On July 1, 2021, TransUnion filed the instant Motion for Summary Judgment alongside accompanying papers and exhibits as well as a Rule 56.1 Statement.  (*See* Not. of Mot.; Def.'s Mem.; Def.'s 56.1; Decl. of Maxwell J. Eichenberger (Dkt. No. 114).)

On August 30, 2021, Plaintiff filed her Opposition to the Motion with the accompanying

Memorandum of Law, exhibits, and a response to TransUnion's Rule 56.1 Statement.  (Pl.'s

Mem.; Sessa Decl.; Pl.'s 56.1 Counterstatement.)

On October 1, 2021, TransUnion filed its Reply Memorandum of Law in Support of its

Motion for Summary Judgment.  (*See* Defendant's Reply Mem. of Law. in Supp. of Mot. for

Summ. J. ("Def.'s Reply Mem.") (Dkt. No. 131).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v.

John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether

summary judgment is appropriate," a court must "construe the facts in the light most favorable to

the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against

the movant."  *Brod v Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted);

*see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294,

314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute

exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also

Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

    "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323–24).  However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that

the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230

(2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis

"Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (citing 15 U.S.C. § 1681).  To realize this aim, Congress fashioned "a private right of action against credit reporting agencies for the negligent . . . or willful . . . violation of any duty imposed under the statute." *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995) (citing 15 U.S.C. §§ 1681o, 1681n).

Plaintiff's FCRA claim falls under § 1681e(b), which states: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

> To succeed on a claim under this section, a plaintiff must establish that: (1) the consumer reporting agency was negligent in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury.

*Ogbon v. Beneficial Credit Servs., Inc.*, No. 10-CV-3760, 2013 WL 1430467, at *6 (S.D.N.Y. Apr. 8, 2013) (quoting *Gorman v. Experian Info. Solutions, Inc.*, No. 07-CV-1846, 2008 WL 4934047, at *4 (S.D.N.Y. Nov. 19, 2008)). [6, 7]  Because there exists no triable issue of fact

---

[6] Because the federal FCRA and the New York State Fair Credit Reporting Act ("NYFCRA") are worded so similarly, "the two statutes must be construed in the same way." *Scott v. Real Est. Fin. Grp.*, 183 F.3d 97, 100 (2d Cir. 1999); *see also Ogbon*, 2013 WL 1430467, at *7 n.6.  The Court therefore reviews the questions at issue with reference to the federal FCRA, but identical outcomes are appropriate regarding Defendant's Motion with respect to analogous state law claims.

[7] Notwithstanding the use of the term "negligence" in the first and fourth elements, "'[l]iability under the FCRA attaches for both negligent violations, which require a showing of actual damages, *see* 15 U.S.C. § 1681o, and willful violations, for which statutory and punitive

regarding whether TransUnion put forward an inaccurate report, TransUnion's Motion is granted.

### 1. FCRA Accuracy Requirements

While commonly articulated as the second element in an FCRA case, the Court reviews the accuracy of TransUnion's report regarding Plaintiff first because reporting accurate information absolves a CRA of liability. *See Wimberly v. Experian Info. Sols., Inc.*, No. 18-CV-6058, 2019 WL 6895751, at *5 (S.D.N.Y. Dec. 18, 2019) (noting that "'if the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary.'" (quoting *Khan v. Equifax Info. Servs.*, LLC, No. 18-CV-6367, 2019 WL 2492762, at *2 (E.D.N.Y. June 14, 2019))); *see also Watson v. Caruso*, 424 F. Supp. 3d 231, 244 (D. Conn. 2019) (same); *Neclerio v. Trans Union*, LLC, 983 F. Supp. 2d 199, 209 (D. Conn. 2013) (same); *Collins v. Experian Credit Reporting Serv.*, 494 F. Supp. 2d 127, 135 (D. Conn. 2007) ("Every circuit to consider the question has agreed that this threshold showing is fundamental to the success of a claim under § 1681e(b)." (collecting cases)).

Unfortunately, however, "[s]ection 1681e(b) does not explain what it means to be 'inaccurate,' nor does it draw a line between factual and legal accuracy." *Denan v. TransUnion LLC*, 959 F.3d 290, 294 (7th Cir. 2020). As discussed more fully below, the Second Circuit has not offered guidance on these questions, though other circuits as well as district courts in the Second Circuit have weighed in on both of these issues. *See, e.g.*, *Wenning v. On-Site Manager, Inc.*, No. 14-CV-9693, 2016 WL 3538379, at *9 (S.D.N.Y. June 22, 2016). That universe of caselaw leads the Court to the conclusion that "inaccurate" for purposes of sustaining an FCRA

---

damages are available, *see* 15 U.S.C. § 1681n." *Burns v. Bank of Am.*, 655 F. Supp. 2d 240, 250 (S.D.N.Y. 2008), *aff'd*, 360 F. App'x 255 (2d Cir. 2010) (quoting *Rosenberg v. Cavalry Invs.*, LLC, No. 03-CV-1087, 2005 WL 2490353, at *2 (D.Conn. Sept. 30, 2005)).

claim comprises: 1) a less-than-comprehensive view of one's credit worthiness via omitting or obscuring details or reporting information different than that furnished by creditors; and 2) has no bearing on legal accuracy, only factual accuracy.

a.  Standards Regarding Substantive Accuracy

"Although the Second Circuit has yet to address the issue, the overwhelming weight of authority holds that a credit report is [substantively] inaccurate either when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect on credit decisions." *Scott v. Synchrony Bank*, No. 20-CV-06524, 2021 WL 2021575, at *5 (W.D.N.Y. May 21, 2021) (quoting *Grayson v. Equifax Credit Info. Servs.*, No. 18-CV-6977, 2021 WL 2010398, at *8 (E.D.N.Y. Jan. 29, 2021) (collecting cases)).  This flexible interpretation stands opposed to one of "technical accuracy." *Fitzgerald v. Chase Home Fin., LLC*, No. 10-CV-4148, 2011 WL 9195046, at *11 (S.D.N.Y. Feb. 28, 2011).[8]

The latter option is suboptimal because its rigidity could safeguard a CRA that provides a credit report with incomplete information, which in turn misleads a business regarding a consumer's credit worthiness and frustrates the FCRA's aforementioned "congressional intent and purpose." *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 41 (D.C. Cir. 1984).  The more flexible standard, by contrast, "provides a method of evaluating compliance with the FCRA that is more closely aligned . . . with the statute's purpose of addressing the 'serious problem in the

---

[8] *See, e.g.*, *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 902 n.7 (3d Cir. 2011) ("[S]ome courts have 'adopted a 'technical accuracy' standard which holds that a credit reporting agency satisfies its duty if it produces a report containing factually correct information about a consumer that is nonetheless misleading or incomplete in another respect.'" (quoting *Smith v. HireRight Solutions, Inc.*, 711 F. Supp. 2d 426, 433 n. 5 (E.D. Pa. 2010)); *Elsady v. Rapid Global Bus. Solutions, Inc.*, No. 09-CV-11659, 2010 WL 2740154, at *6 (E.D. Mich. July 12, 2010) ("Several courts . . . have held that a report is accurate for the purposes of the FCRA so long as it is technically accurate, or accurate on its face." (collecting cases)).; *Dickens v. Trans Union*, 18 F. App'x. 315, 318 (6th Cir. 2001) (adopting a "technically accurate" standard).

credit reporting industry . . . of inaccurate or misleading information.'" *Kilpakis v. JPMorgan Chase Fin. Co., LLC*, 229 F. Supp. 3d 133, 142 (E.D.N.Y. 2017) (emphasis omitted) (quoting *Koropoulos*, 734 F.2d at 40 n.4). To effectuate congressional intent behind the FCRA, the Court follows the weight of authority and adopts the flexible standard. In adopting and applying this standard, though, the Court must determine what constitutes a "misleading" or "patently incorrect" report. *Scott*, 2021 WL 2021575, at *5 (quotation marks and citation omitted).

Courts that found credit reports misleading have zeroed in on two types of infractions: (1) if it "omitted information [that] resulted in a misunderstanding on the part of the recipient," *Elsady*, 2010 WL 2740154, at *6; *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 896 (5th Cir. 1998) (concluding a report may be misleading if it is "incomplete"); *Kilpakis*, 229 F. Supp. 3d at 142 (observing a report can be misleading if it "told only part of the story"), or (2) if it obscured certain facts in such a way leaves it "open to an interpretation that is directly contradictory to the true information," which would in turn lead the report's recipient to misperceive the individual's credit worthiness, *Wagner v. TRW, Inc.*, 139 F.3d 898 (5th Cir. 1998); *see also Dickens*, 18 F. App'x at 318.

Caselaw finding a CRA's report to be "patently incorrect" is scarce.[9] Courts have simply hypothesized that facially incorrect information would include "inaccurate amounts, tradeline items not immediately removed once vacated, and inaccurately updated loan terms." *Rodas v. Experian Info. Sols., Inc.*, No. 19-CV-07706, 2020 WL 4226669, at *2 (N.D. Ill. July 23, 2020), *aff'd sub nom. Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562 (7th Cir. 2021) (citing

---

[9] Because Congress prescribed a specific mechanism for consumers to redress such errors, *see* 15 U.S.C. § 1681i(a)(1)(A), it stands to reason that consumers and furnishers could remedy a dispute absent judicial intervention, which would explain the dearth of contrary precedent.

*Zahran v. TransUnion Corp.*, No. 01-CV-1700, 2003 WL 1733561 at *4 (N.D. Ill. Mar. 28, 2003)).  Thus, under the prevailing flexible standard, for a CRA's report to be deemed substantively "accurate," it must give its recipient a fulsome picture of one's credit worthiness by avoiding glaring omissions or typographical errors that would otherwise skew such a determination.

### b.  Standards Regarding Factual and Legal Accuracy

All circuit courts to have opined on whether accuracy in the FCRA context includes legal inaccuracies are unanimous: "The claimed inaccuracy must be factual, not legal."  *Sobenes v. TransUnion Data Sols.*, No. 19-CV-7114, 2021 WL 214640, at *2 (N.D. Ill. Jan. 21, 2021) (citing *Juarez v. Experian Info. Sols., Inc.*, No. 19-CV-7705, 2020 WL 5201798, at *3 (N.D. Ill. Aug. 31, 2020)); *see also Batterman v. BR Carroll Glenridge, LLC*, 829 F. App'x 478, 481 (11th Cir. 2020); *Brill v. TransUnion LLC*, 838 F.3d 919, 921 (7th Cir. 2016); *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68 (1st Cir. 2008).  And while not explicitly adopting this view, the Second Circuit has also affirmed a "well-reasoned [district court] order" that adopted this interpretation in a non-binding summary order.[10]  *Okocha v. Trans Union LLC*, 488 F. App'x 535, 536 (2d Cir. 2012) (summary order) (affirming *Okocha v. Trans Union LLC*, No. 08–CV– 3107, 2011 WL 2837594 (E.D.N.Y. Mar. 31, 2011)).  Though the Second Circuit's endorsement in *Okocha* does not control here, "courts in the Second Circuit have often noted that . . . [s]ummary [o]rders . . . can be instructive to district courts in resolving particular disputes, and also may be seen as highly persuasive and predictive of how the Second Circuit Court of Appeals would decide an issue in the future."  *Liana Carrier Ltd. v. Pure Biofuels Corp.*, No. 14-CV-

---

[10] *See* Local Rule 32.1.1(a).

16

3406, 2015 WL 10793422, at *4 (S.D.N.Y. Aug. 14, 2015) (citation omitted), *aff'd*, 672 F. App'x 85 (2d Cir. 2016).

Aside from the persuasive value of the Second Circuit's summary order, several convincing arguments underpin the conclusion that accuracy with respect to FCRA claims applies to factual but not legal accuracy. First, under the FCRA's statutory scheme, "[o]nly furnishers are tasked with accurately reporting liability." *Denan*, 959 F.3d at 295 (citing 12 C.F.R. § 1022.41(a)). CRAs are bound by no comparative duty. Absent such a charge codified in an appropriate statute or regulation, there is no statutory support for any position that would require CRAs to undertake a legal determination—particularly a duplicative one.

Second, and relatedly, having charged a furnisher with the duty to review the legal validity of a debt via applicable regulation, Congress and the CFPB clearly knew what language would charge CRAs with an identical duty. *See Colgrove v. Battin*, 413 U.S. 149, 163 (1973) ("If Congress had meant to [obligate CRAs to make legal determinations and hold them liable for such determinations,] 'it knew how to use express language to that effect.'") (quoting *Williams v. Florida*, 399 U.S. 78, 97 (1970)); *see also NLRB v. Canning*, 573 U.S. 513, 600 (2014) (Scalia, J., concurring in judgment) ("If the [legislature] had thought [to enact a given scheme], they would have known how to do so."). That there is no analogous charge on CRAs therefore militates towards absolving CRAs from this responsibility.

Third, policy positions also support this understanding. Creditors are "in a better position to determine the validity" of a debt instrument they themselves hold than CRAs. *Brill*, 838 F.3d at 921; *see also Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1156 (9th Cir. 2009) (noting that "the furnisher of credit information stands in a far better position to make a thorough investigation of a disputed debt than the [consumer reporting agency]"). Moreover, putting such

a burden on a CRA "would substantially increase the cost of their services," forcing CRAs "to pass on the increased costs to their customers and ultimately to the individual consumer." *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994).  *Cf. Safeco*, 551 U.S. at 52 (noting Congress's intent to "promote efficiency").

Numerous federal courts at both the trial and appellate levels have come to this conclusion and subsequently dismissed claims against or granted summary judgment for CRAs in cases wherein creditors asserted claims of inaccuracy based on purportedly incorrect legal determinations, which influenced debt obligations.  *See, e.g.*, *Denan*, 959 F.3d at 295–96 (affirming dismissal because plaintiffs' arguments "amount[] to non-adjudicated legal defenses to their debts"); *Humphrey v. Trans Union LLC*, 759 F. App'x 484, 488 (7th Cir. 2019) (affirming summary judgment for CRA Defendants because "CRAs are not a tribunal sitting to resolve legal disputes"); *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010) (denying a rehearing and rehearing en banc because FCRA "claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts"); *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 41 (1st Cir. 2010) (affirming summary judgment where no "factual inaccuracies" were stated, only legal disputes); *DeAndrade*, 523 F.3d at 68 (affirming summary judgment where a disputed debt obligation was considered "a legal issue that a credit agency such as Trans Union is neither qualified nor obligated to resolve under the FCRA"); *Chijioke-Uche v. Equifax Info. Servs., LLC*, No. 19-CV-4006, 2021 WL 2005499, at *3 (E.D. Pa. May 20, 2021) (granting summary judgment on a § 1681e(b) claim because the alleged inaccuracy "involves a determination of whether [the] [p]laintiff and [the furnisher] comported with their contractual duties"); *Baldeosingh v. Trans Union*, No. 20-CV-925, 2021 WL 1215001, at *4 (M.D. Fl. Mar. 31, 2021) (dismissing § 1681e(b) claim where "[t]o delete the [] tradeline from

[the] [p]laintiff's credit file as he requested, TransUnion needed to: (1) review the terms of the

sale agreement; (2) determine the parties' performance obligations; and (3) decide whether [the

furnisher] complied with the agreement"); *Wilcox v. Servis One, Inc.*, No. 19-CV-2535, 2020

WL 4903893, at *4 (D. Md. Aug. 19, 2020) (dismissing § 1681e(b) claim where resolution of the

plaintiff's claim that fees breached a settlement agreement required "a legal interpretation of the

contractual terms in the settlement agreement, an exercise which the FCRA does not require of

credit reporting agencies"); *Garland v. Marine Credit Union*, No. 18-CV-270, 2018 WL

5313769, at *4 (E.D. Wis. Oct. 26, 2018) (granting summary judgment on § 1681e(b) claim

because the plaintiff did not challenge "a factual inaccuracy in [the] [d]efendants' reporting but

rather [raised] a legal dispute regarding the impact" of state law on a reported debt); *Barsky v.

Experian Info. Sols., Inc*, No. 15-CV-1017, 2016 WL 4538526, at *2 (E.D. Mo. Aug. 30, 2016)

(dismissing the plaintiff's claims under that her debts § 1681e(b) because they relied upon the

argument that the debts were barred by applicable statute of limitations, which is an unactionable

legal question); *Fashakin v. Nextel Commc'ns*, No. 05-CV-3080, 2009 WL 790350, at *11

(E.D.N.Y. Mar. 25, 2009) (granting summary judgment where the "plaintiff's dispute of the debt

turned on a collateral attack on the validity of the debt").  In sum, CRAs cannot be held liable

when the accuracy at issue requires a legal determination as to the validity of the debt the agency

reported; conversely, CRAs can only be held liable for FCRA claims when the information

reported does not match the information furnished.

### 2.  TransUnion Reported Factually Accurate Information

The Parties dispute the accuracy of the report rendered.  In broad strokes, Plaintiff argues

that TransUnion furnished an inaccurate credit report because Plaintiff did not owe the residual

value of the car as a debt.  (*See* Pl.'s Mem. 8–13.)  Conversely, TransUnion argues that it

reported information accurately with respect to what HVFCU, the furnisher, provided and that it is not required to—and, indeed, cannot—challenge the legal validity of the debt instrument as furnished by HVFCU.  (*See* Def.'s Mem. 8–13.)

TransUnion is correct.  Even when read in a light most favorable to Plaintiff, as the Court must, because TransUnion reported the exact information it received from a data furnisher without omitting salient details or presenting the information in a misleading fashion, Plaintiff cannot establish as a matter of law that TransUnion reported inaccurate information. Accordingly, there exists no genuine issue of fact as to whether TransUnion violated the FCRA, and the Court must grant TransUnion's Motion.

The sole dispute turns on whether Plaintiff in fact owes a balloon payment at the culmination of the lease term.  Yet, Plaintiff admits that "[t]he data Hudson Valley furnished to Trans[]Union indicated that Plaintiff owed a balloon payment of $19,444.00 . . . that was due on January 1, 2022."  (Pl.'s 56.1 Counterstatement ¶ 8 (citations omitted).)  This fact alone sustains TransUnion's argument, as Plaintiff's concession is all Defendant needs to undermine Plaintiff's claim and absolve itself of FCRA liability.  *See Frydman v. Experian Info. Sols., Inc.*, No. 14-CV-9013, 2016 WL 11483839, at *8 (S.D.N.Y. Aug. 11, 2016), *report and recommendation adopted*, No. 14-CV-9013, 2016 WL 5661596 (S.D.N.Y. Sept. 30, 2016) ("As a threshold matter, to assert a successful claim under [] Section 1681e(b) [the plaintiff] must establish that the [report] contained inaccurate information.").  Moreover, Plaintiff also admits that she never contested the data with Defendant once it was furnished by HVFCU.  (*See* Pl.'s 56.1 Counterstatement ¶ 62.)  Plaintiff instead contested the information "with her lessors," (*id.* ¶ 60 (citing Sessa Decl., ¶¶ 6-17)), exactly as the "FCRA expects," *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1244 (10th Cir. 2015).

20

In her defense, Plaintiff argues that the information was inaccurate, and that TransUnion knew that to be the case, for three reasons: first, because the loans were "a sham under the Truth in Lending Act and Consumer Leasing Act" pursuant to the debt's terms, (*see* Pl.'s Mem. 15); second, because TransUnion's agreements with HVFCU stated that HVFCU was only authorized to furnish "loan records" rather than lease records, though the data furnished was classified as lease data, (*see id*. at 15–16); and third, because in two prior instances consumers raised a dispute with TransUnion regarding data furnished with respect to allegedly similar car leases and correspondent balloon payments, (*see id*. at 16).

Unfortunately for Plaintiff, her assertions, even if true, miss the mark and fail to cure her claim's infirmity for one clear reason: they do not disprove the fact that the credit report Defendant published accurately reflected the data furnished by HVFCU. *Cf. DeAndrade*, 523 F.3d at 67 ("At the very least, it is difficult to see how a plaintiff could prevail on a claim for damages under [the FCRA] without a showing that the disputed information disclosed by the credit agency was, in fact, inaccurate.")

It may be the case that the terms of the lease contradict the data HVFCU furnished— though, to be clear, the Court is in no way opining on this question. But Plaintiff cannot reframe this purportedly "implausible interpretation[]" as a matter of fact. (Pl.'s Mem. 9.) This is at its core "a contractual dispute," *Batterman*, 829 F. App'x at 481, and one not before this Court. "[A]bsent prior notice from the consumer that the information may be inaccurate," *Henson*, 29 F.3d at 285, or a ruling from a court or neutral arbitrator to that effect, *see Scheel-Baggs v. Bank of Am.*, 575 F. Supp. 2d 1031, 1042 (W.D. Wis. 2008) (concluding that "after the arbitrator dismissed FIA's claim against plaintiff, the legal question was resolved[,] [so] she no longer owed the debt and any credit report stating the contrary was factually inaccurate.") (italics

omitted), so long as TransUnion disseminated the information as it was furnished by HVFCU, it cannot be held to account for another participant's legal determination.

Plaintiff tacitly concedes that this is a legal dispute, as Plaintiff describes TransUnion as having taken a "position" by "rel[ying] on [] interpretations" of the debt instrument. (Pl.'s Mem. 9.) Plaintiff then goes on to attack TransUnion's "interpretation" of the contractual obligation. (*Id.* at 10.) These are, simply put, legal terms, which bespeak legal arguments regarding the debt's legal validity, not factual disputes regarding whether Defendant reported accurate numbers. So, too, is Plaintiff's argument with respect to the "sham" loans telling. One must make a legal interpretation of the loan's terms and their application to the statutes in question to even countenance this argument. Thus, by her own verbiage and arguments, Plaintiff confirms TransUnion's position that any purported inaccuracy—to the extent one exists—is solely borne of legal interpretation for which TransUnion may not be held liable. *See supra* II.B.1.ii.

Plaintiff does not raise any other allegations of inaccuracy. Plaintiff does not suggest that pertinent or material information was missing or omitted in TransUnion's credit reporting regarding Plaintiff, nor does Plaintiff suggest that furnishers, the credit rating agency, and third parties were misaligned in their understanding of the obligation due to strange verbiage or errant annotation. Thus, TransUnion's report cannot be said to be misleading or patently inaccurate.

Because "[P]laintiff[']s[] complaint pleaded only speculative legal inaccuracies," *Denan*, 959 F.3d at 297, Defendant's report is considered accurate pursuant to the FCRA, and as a result, Plaintiff cannot sustain a claim thereunder. For this reason, the TransUnion's Motion for summary judgment must be granted.

III.  Conclusion

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 111),

enter judgment for Defendant, and close this case.

SO ORDERED.

DATED:       December 20, 2021
                 White Plains, New York

                                             KENNETH M. KARAS
                                    United States District Judge

23